UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TUNECORE, INC.,

       Plaintiff,

     - against -

FARYAL KHAN-THOMPSON, and CD BABY, INC.

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

23 Civ. _____

**COMPLAINT**

    Plaintiff TuneCore, Inc. ("TuneCore" or "Plaintiff"), by its attorneys Epstein Becker & Green, P.C., as and for its Complaint, alleges as follows:

## INTRODUCTION

    1.   After being terminated from plaintiff TuneCore, a leading provider of music distribution, publishing administration, and licensing services, and while employed by its direct competitor, defendant CD Baby, Inc. ("CD Baby"), defendant Faryal Khan-Thompson ("Khan-Thompson") repeatedly hacked into TuneCore's secured cloud server to access and download confidential documents and information.

    2.   Khan-Thompson laid the groundwork for her corporate surveillance and misappropriation during the waning days of her employment as a high-level marketing executive at TuneCore, when, knowing that her termination was imminent, she caused a second set of credentials—using her personal email address—to be created to gain unauthorized access TuneCore's confidential documents after her employment ended.

    3.   By doing so, Khan-Thompson created a backdoor entrance to access TuneCore's most confidential information after her official TuneCore credentials were disabled, which occurred in March 2023 when she was terminated.

4.      From at least May 2023 through October 2023, Khan-Thompson used her personal credentials to gain unauthorized access into TuneCore's secured cloud network, where she accessed, viewed, and/or downloaded confidential and proprietary documents in at least 103 separate instances. (TuneCore's investigation is ongoing.)

5.      Khan-Thompson continued to access, view, and/or download confidential and proprietary documents after being hired in July 2023 by TuneCore's direct competitor, defendant CD Baby.

6.      Among the documents Khan-Thompson accessed or downloaded are TuneCore's confidential PowerPoint decks including its "2023-2024 Product Strategy Road Map," "International 3 Year Strategy 2022-2025," "Technology Plan for 2023 & Beyond," "Content Strategy US - International," "International Team Top Strategic Recommendations," and "3 Year Planning Product," as well as notes from TuneCore's internal confidential company meetings.

7.      Information contained in the confidential documents that Thompson-Khan improperly accessed, viewed, and/or downloaded, individually and cumulatively, would be invaluable to a competitor, permitting it to, among other things, preempt and usurp TuneCore's marketing strategies, products, content, and pricing strategies in both established and emerging markets, and irreparably harm TuneCore's business.

8.      Khan-Thompson's brazen conduct is in breach of her Proprietary Information Agreement and her Transition and Separation Agreement, pursuant to which she agreed to keep such information confidential.

9.      Her conduct, moreover, constitutes violations of the Defend Trade Secrets Act and the Computer Fraud and Abuse Act.  She is also liable for common law misappropriation of trade secrets, breach of contract, and breach of fiduciary duty.

10. Accordingly, TuneCore has commenced this action to obtain provisional and injunctive relief against Khan-Thompson and her current employer, CD Baby, enjoining the use or dissemination of the confidential information, and to obtain other emergent relief to allow TuneCore to avoid irreparable harm and maintain the status quo, and to recover damages from CD Baby.

11. TuneCore also seeks expedited discovery so that it can locate and meaningfully quarantine the Confidential Information that Khan-Thompson misappropriated.

## PARTIES

12. TuneCore is a corporation, incorporated in New York and with its principal place of business in Brooklyn, New York.

13. Defendant Khan-Thompson is an individual who resides in New York. Khan-Thompson was employed by TuneCore in the high-level marketing position of Vice President, International, from October 2020 to March 2023. Khan-Thompson has been employed by CD Baby, TuneCore's competitor, since July 2023.

14. Defendant CD Baby is corporation incorporated in Delaware with its principal place of business in Portland. CD Baby maintains offices and employees, as well as transacts business, in New York.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because there is a federal question under the Defend Trade Secrets Act (18 U.S.C. § 1836, et seq.) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030(g)).

16. This Court has supplemental jurisdiction pursuant to 28 U.S.C § 1367 of all other claims that do not arise under the Constitution, laws, or treaties of the United States.

17.     Venue is proper pursuant to 28 U.S.C. § 1391 because TuneCore's principal place of business is in New York and a substantial part of the events or omissions giving rise to TuneCore's claims occurred in this judicial district.

## FACTS

### A.     Khan-Thompson Was A Top Marketing Executive With Access To TuneCore's Most Sensitive Competitive Information

18.     TuneCore, founded in 2006, is a leading music distribution, publishing, and licensing service.

19.     TuneCore's clients are recording artists, songwriters, record labels, and music managers.  Its roster has included such notable acts as Nine Inch Nails, Drake, Ziggy Marley, Keith Richards, Jay- Z, Cheap Trick, Moby, Public Enemy, Ed Sheeran, and hundreds of thousands of other artists both emerging and established.

20.     Through its music distribution services, TuneCore enables its clients to stream their sound recordings and collect royalties through applications such as Spotify, Apple Music, Amazon Music, Deezer, and TikTok. Through its music publishing services, TuneCore helps clients collect royalties for their musical compositions. And through its licensing services, TuneCore helps clients secure placement opportunities in film, TV, commercials, and video games.

21.     TuneCore hired Khan-Thompson in or about October 2020 to serve as Vice President, International, a position she held until her termination on March 22, 2023.

22.     In her role as TuneCore's Vice President, International, Khan-Thompson oversaw TuneCore's existing international marketing teams and oversaw TuneCore's growth and global expansion into key strategic countries and territories.

4

23.     In her executive role, Khan-Thompson had access to TuneCore's most confidential and proprietary strategic business, financial, and marketing information.

**B.      Khan-Thompson Agrees To Maintain The Confidentiality Of TuneCore Information Both During And After Her Employment With TuneCore**

*The Employee Proprietary Information Agreement*

24.     On or about August 3, 2020, prior to the commencement of Khan-Thompson's at-will employment with TuneCore, Khan-Thompson signed a proprietary information and inventions assignment agreement prior to the beginning of her employment (the "PIA").

25.     Paragraph 2.A of the PIA provides in relevant part:

> Company Information.  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that "Confidential Information" means any non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans, pricing information and strategy, personnel information (regarding other employees' compensation, discipline, and performance) or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), contract terms and negotiations, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information.

26.     With respect to Khan-Thompson's obligation to return and not retain TuneCore information upon the termination of her employment, Paragraph 5 of the PIA provides in relevant part:

> Returning Company Documents. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or

reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to Section 3.D.

27.     The PIA further stated that, while certain employment-related disputes would be

arbitrated, injunctive relief is available in court for the misappropriation of proprietary

information and that a violation of any the PIA, or any other agreement regarding confidential

information, would cause irreparable harm.

28.     Specifically, Paragraph 10.D of the PIA provides in relevant part:

<u>Availability of Injunctive Relief</u>. IN ADDITION TO THE RIGHT UNDER THE RULES TO PETITION THE COURT FOR PROVISIONAL RELIEF, I AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF THE PROPRIETARY INFORMATION AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NONSOLICITATION, NON-COMPETITION OR THE EXCEPTION TO ASSIGNMENTS LISTED IN SECTION 3(F). I UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION.

***The Employee Handbook***

29.     Khan-Thompson also received and agreed to abide by TuneCore's Employee

Handbook.

30.     The Employee Handbook contains specific provisions regarding TuneCore's

confidential information. Specifically, Section 6-10 of the Handbook expressly prohibits the

unauthorized disclosure of TuneCore's confidential information, including:

products or services, processing, marketing and sales, client lists, client e-mail addresses and mailing addresses, client data, orders, memoranda, notes records, technical data, sketches, designs, plans, draws, trade secrets, research and development data, experimental work, proposals, new product and/or

service developments, project reports, sources of supply and material, operating and cost data, and corporate financial information.

31.    The Employee Handbook further provides that it is "extremely important that all such information remain confidential, and particularly not be disclosed to the Company's competitors," and that employees, such as Khan-Thompson, are "subject to the Company's policies prohibiting the nonbusiness use or dissemination" of such information.

***The Transition and Separation Agreement and the Supplemental Release Agreement***

32.    On or about December 6, 2022, TuneCore decided to terminate Khan-Thompson's at-will employment, subject to Khan-Thompson remaining employed for a defined period (the "Transition Period"), pursuant to the terms of a Transition and Separation Agreement and general release ("TSA").

33.    Pursuant to the TSA, Khan-Thompson was eligible to receive certain benefits, including bonuses and outplacement services (the "Transition Benefits") during the Transition Period, provided she complied with the TSA's terms and conditions and executed a supplemental release agreement ("SRA"), *inter alia*, releasing claims against TuneCore.

34.    Section 2(a) of the TSA requires Khan-Thompson to abide by TuneCore policies during the Transition Period.

35.    Under the TSA Khan-Thompson's "Transition Period" concluded on the earlier of March 31, 2023, or the date of her voluntary resignation of termination by TuneCore for committing material breach of the TSA (referred to in the TSA as the date of an "Early Termination").

36.    The TSA does not supersede and expressly leaves in place the terms of the PIA and, with respect to TuneCore's property, it adds the following provision:

*Return of Property*. On or before the Separation Date, you shall return to the Company any and all Company property, including, but not limited to, documents (in whatever paper or electronic form they exist), things relating to the business of the Company and all intellectual, electronic and physical property belonging to the Company that is in your possession or control. This obligation to return all Company documents includes but is not limited to any documents stored electronically on any computer, email account, mobile phone, tablet, electronic storage device, or cloud computing software (such as Dropbox or Google Drive), as well any emails, instant messages, Excel spreadsheets, PowerPoint presentations, or other documents or correspondence that contain the Company's Proprietary Information (as defined in the Employee PIA).

37.     Khan Thompson signed the TSA on December 12, 2022.

38.     In or about March 22, 2023, TuneCore exercised its right to Early Termination of Khan-Thompson's employment under the TSA after it discovered certain outside business activities by Khan-Thompson that constituted a material breach of TuneCore policies, the PIA, and the TSA.

39.     Despite her ineligibility for Transition Benefits under the TSA due to Early Termination, TuneCore nevertheless extended the SRA to Khan-Thompson, consistent with the form attached to the TSA, which would entitle her to certain Transition Benefits subject to terms and conditions.

40.     The SRA, *inter alia*, references, expressly does not supersede, and reaffirms the terms of the PIA, and includes the same "Return of Property" provision as set forth in the TSA.

41.     On March 28, 2023, in correspondence enclosing the SRA, TuneCore informed Khan-Thompson in relevant part as follows:

Please understand that you have continuing obligations under your [PIA], dated August 3, 2020, regardless of whether you sign the [SRA]. In particular, upon the Separation Date, you are required to promptly return to the Company: (a) all Company property issued to you, including but not limited to computers (and any computer-related equipment), mobile telephones, electronic storage devices, or any other Company property or equipment that is owned or issued to you by the Company and (b) any and all documents that

contain the Company's Confidential Information (as defined in the Employee PIA), including but not limited to any documents stored electronically on any computer, email account, mobile phone, tablet, electronic storage device, or cloud computing software (such as Dropbox or Google Drive), as well any emails, instant messages, Excel spreadsheets, PowerPoint presentations, or other documents or correspondence that contain the Company's Confidential Information.

42.     Khan-Thompson engaged in multiple rounds of revisions to the SRA but ultimately refused to sign it.

43.     On July 7, 2023, at Khan-Thompson's request, TuneCore agreed to a limited waiver of certain non-competition provisions contained in the PIA to enable Khan-Thompson to join CD Baby; however, in doing so, TuneCore expressly notified Khan-Thompson that, notwithstanding such limited waiver, "[a]ll other provisions of the Agreement which, by their nature, remain in effect after the term of your employment, shall remain in effect, including, but not limited to, the Confidential Information provisions in section 2 of the Agreement . . . ."

**C.     Khan-Thompson, Prior To Her Termination, Surreptitiously Grants Her Personal Email Account Access To TuneCore's Cloud Network**

44.     TuneCore maintains its confidential information on Google Workspace, a secured cloud network that may only be accessed by TuneCore's authorized users.

45.     To access Google Workspace, an authorized user must have a unique username and password.

46.     TuneCore employees are prohibited from maintaining multiple credentials to access Google Workspace. They must use a single username, and it must be their TuneCore-issued email address.

47.     TuneCore employees, including Khan-Thompson, received training on TuneCore's policy regarding safekeeping of confidential information on electronic databases.

48.     As detailed above, in December 2022, Khan-Thompson agreed to a planned exit from TuneCore and executed the TSA.

49.     Upon information and belief, Khan-Thompson caused an unauthorized account associated with her own personal Gmail account to be credentialed to access TuneCore's secure network, giving her backdoor access to TuneCore's database, which housed TuneCore's most confidential and proprietary information regarding its marketing, sales, products, services, pricing, and client lists.

50.     By credentialing her personal Gmail account to Google Workspace, Khan-Thompson provided herself with an alternative means of accessing the confidential data in TuneCore's database if her TuneCore-issued email was disabled.

51.     TuneCore did not authorize and was not aware of Khan-Thompson's conduct at the time, and only became aware following an investigation that commenced in late October 2023 after it discovered suspicious activity on its system, as described below.

**D.      After Her Termination From TuneCore, Khan-Thompson Joins TuneCore's Direct Competitor, CD Baby, As A Senior Marketing Executive**

52.     When TuneCore terminated Khan-Thompson on March 22, 2023, as noted above, it suspended her Google Workspace credentials the same day.

53.     Upon information and belief, Khan-Thompson joined CD Baby, TuneCore's direct competitor, on July 6, 2023, where she currently serves as Senior Vice President of Marketing and Community Engagement.

54.     Like TuneCore, CD Baby is in the music distribution, publishing administration, and licensing business.

55.     CD Baby, like TuneCore, enables its clients to distribute sound recordings to streaming services across the world, including Spotify, Apple Music, TikTok, Amazon, and

Deezer, and to collect publishing royalties, as well as to license music to film, television, commercials, and video games.

56.     The music distribution business in which TuneCore and CD Baby operate is extremely competitive.

**E.     Khan-Thompson Repeatedly Accesses And Downloads Confidential Documents After Her Termination From TuneCore And While Employed By CD Baby**

57.     In or about October 2023, TuneCore discovered that an unauthorized set of credentials for Khan-Thompson's personal email account had access to its secure Google Workspace drive used by TuneCore's marketing department and others within the Company to house confidential and proprietary documents, including high-level financial information, client lists, and proprietary marketing information (the "Creative Drive").

58.     Upon learning of Khan-Thompson's unauthorized credentials, TuneCore conducted a search to ascertain whether and when Khan-Thompson had used her credentials to access the Creative Drive.

59.     TuneCore discovered that from at least May 2023 through October 2023—after she had been terminated and during certain times when she was employed as Senior Vice President of Marketing and Community Engagement at CD Baby—Khan-Thompson accessed, viewed, and/or downloaded confidential and proprietary TuneCore documents on the Creative Drive, including the Confidential Information, in approximately 103 different instances.

60.     Among the approximately 50 unique documents that Khan-Thompson improperly accessed, viewed, and/or downloaded were:

- An Excel spreadsheet entitled "#IndependentAF VIPs List for Merch Drop.xlsx," containing multiple tabs for 11 different countries and global regions listing the most promising TuneCore clients—"VIPs"—along with key information about them, such as their names, physical addresses, email addresses, Instagram handles, number of "followers," and other important proprietary information that TuneCore compiled for this client list. Defendant Khan-Thompson accessed this

11

document on or about July 25, 2023—while she was Senior VP of Marketing and Community Engagement at CD Baby.

- A 53-page PowerPoint presentation entitled, "2023-2024 Product Strategy Road Map," which details TuneCore's market strategies and playbook laying out how TuneCore planned to execute those strategies through the end of 2024, including its plans to roll out new products and pricing information for those products. Defendant Khan-Thompson downloaded this document on or about July 5, 2023—two days before she began working as Senior VP of Marketing and Community Engagement at CD Baby.

- A 59-page PowerPoint presentation, titled "International 3 Year Strategy 2022-2025" that identifies the specific countries and markets TuneCore plans to expand into pursuant to a six-phase strategy through 2025, detailing, among other things, TuneCore's product, content and pricing roll outs. Defendant Khan-Thompson accessed this document on or about June 22, 2023—two weeks before she began working as Senior VP of Marketing at CD Baby.

- A 26-page deck titled, "Technology Plan for 2023 & Beyond" that details TuneCore's internal engineering structure, along with its specific growth and scale plans. Defendant Khan-Thompson downloaded this document on or about July 5, 2023—two days before she began working as Senior VP of Marketing and Community Engagement at CD Baby.

- An 18-page deck titled, "Content Strategy US-International," dated June 2023—i.e., after Khan-Thompson was terminated. The deck that details TuneCore's "Key Objectives" with respect to distributing TuneCore content in international and domestic markets. Defendant Khan-Thompson accessed this document on or about June 23, 2023—two weeks before she began working as Senior VP of Marketing and Community Engagement at CD Baby.

- A 28-page deck titled, "3 Year Planning Product" that details, among other things, a breakdown of TuneCore's revenue sources, TuneCore's marketing plans through 2024. Defendant Khan-Thompson downloaded this document on or about July 5, 2023—two days before she began working as Senior VP of Marketing and Community Engagement at CD Baby.

- A 37-page deck titled, "International Team Top Strategic Recommendations," dated February 2021. Among other things, the deck details TuneCore's strategic plans for products and pricing in "emerging and mature" markets. Defendant Khan-Thompson downloaded this document on or about July 20, 2023—while she was employed as Senior VP of Marketing and Community Engagement at CD Baby.

- PowerPoint presentations from internal company meetings from the preceding two years, showing among other things, TuneCore's "Top Priorities" for the year. Defendant Khan-Thompson accessed these documents throughout the summer of

2023, and as recently as September 25, 2023— while she was employed as Senior VP of Marketing and Community Engagement at CD Baby.

61.     These documents, along with the other documents that Khan-Thompson improperly accessed, viewed, and/or downloaded, reflect TuneCore's current and prospective marketing, distribution, content, pricing, and engineering strategies in both established and emerging markets as well as the financial information concerning TuneCore, and TuneCore's client lists (the "Confidential Information").  As such, they are TuneCore's trade secrets.

62.     Khan-Thompson surreptitiously continued to access and download TuneCore's Confidential Information after she joined TuneCore's direct competitor, CD Baby.

**F.     TuneCore's Injuries**

63.     If the Confidential Information was or is being used by Khan-Thompson's current employer and Tune Core's direct competitor, CD Baby, TuneCore will suffer substantial and irreparable harm.

64.     For example, the "#IndependentAF VIPs List for Merch Drop.xlsx," lays bare the most promising results of Tune Core's internal processes to identify the valuable clients that would lead to revenue, not only assessing each's market reach and impact, but also specifying the means to contact each.

65.     If such information is disclosed to and used by a competitor, such as CD Baby, TuneCore is rendered extremely vulnerable.  CD Baby can simply target each of those clients, taking for itself the revenue the clients would generate, and all at TuneCore's expense.

66.     Similarly, the decks titled, "International 3 Year Strategy 2022-2025" and "Content Strategy US-International," "3 Year Planning Product," and "International Team Top Strategic Recommendations" contain self-critical analyses of TuneCore's operations, essentially

giving a competitor a how-to manual for reengineering its own business processes to meet and attempt to unfairly compete with TuneCore.

67.     When such information is in the hands of a competitor, such as CD Baby, TuneCore is rendered acutely vulnerable.  Not only might such competitor be able to specifically tailor its business processes to meet and unfairly compete with TuneCore's business, but it also could leverage the results of TuneCore's own internal research, business process and deliberations, to use TuneCore's own work product—misappropriated from TuneCore at no expense—to unfairly compete against it.

68.     The Confidential Information also includes TuneCore's confidential financial information. For example, the "3 Year Planning Product" deck, breaks down exactly how much revenue TuneCore generates from certain categories of its business, revealing the constituent parts of TuneCore's most valuable market segments.  Along with all the other strategic and internal assessments betrayed by the Confidential Information described above, such information would allow a competitor to target those very same markets, and specifically tailor and pivot its business to meet TuneCore's strengths and weaknesses and thereby steal its market share.

69.     Further, the Confidential Information includes numerous case studies that depict, chapter-and-verse, what worked and what did not work for TuneCore in different global markets, as well as its strategy in those markets going forward.  The case studies include internal data analytics on internet traffic and new revenue-generating clients—extremely valuable information—broken down country-by-country or region-by-region.  In the hands of competitor, such information provides a road map to match TuneCore's efforts or unfairly compete with TuneCore in those international markets.

70.     Given the breadth of the confidential information misappropriated by Khan-Thompson post-employment, including at times while she was employed with CD Baby, TuneCore cannot estimate with any degree of certainty the nature and extent of its potential damages to be incurred as a direct consequence of Khan-Thompsons's misconduct.

71.     As such, the damages and injuries threatened by reason of Khan-Thompson's misconduct are irreparable and TuneCore has no adequate remedy at law to protect itself.

**FIRST CAUSE OF ACTION**
**(Misappropriation of Trade Secrets in Violation of the**
**Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(B)(1), *et seq*., Against All**
**Defendants)**

72.     TuneCore repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

73.     TuneCore owned and possessed certain confidential, proprietary and trade secret information, as alleged above.

74.     This confidential, proprietary and trade secret information relates to products and services provided, used, sold, shipped, and ordered in, or intended to be provided, used, sold, shipped and/or ordered in, interstate commerce.

75.     TuneCore has taken reasonable measures to keep such information secret and confidential.

76.     This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

77. In violation of TuneCore's rights, Khan-Thompson misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

78. The trade secret information accessed and stolen by Khan-Thompson includes (but is not limited to) approximately 50 unique documents identified by TuneCore, as described more fully above as the Confidential Information.

79. In violation of TuneCore's rights, Khan-Thompson misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein, within the meaning of the DTSA, 18 U.S.C. § 1836, by acquiring, using and/or disclosing TuneCore's trade secrets and continuing to possess, use, and/or disclose them for her and CD Baby's economic benefit.

80. Khan-Thompson's misappropriation of the confidential, proprietary and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

81. Khan-Thompson misappropriated such information in her personal capacity as well as in her capacity as CD Baby's Senior Vice President of Marketing and Community Engagement.

82. If Khan-Thompson's conduct is not remedied, and if Khan-Thompson and CD Baby are not enjoined as requested herein, they will continue to misappropriate, disclose, and use TuneCore's trade secret information for their own benefit and to TuneCore's detriment.

83. As the direct and proximate result of Khan-Thompson's conduct, as alleged above, TuneCore has suffered and, if such conduct is not stopped, TuneCore will continue to suffer, irreparable injury.

84.     In addition, as a direct and proximate result of Khan-Thompson's misappropriation, Khan-Thompson and CD Baby have been unjustly enriched because of the misappropriation of TuneCore's trade secrets within the meaning of § 1836(b)(3)(B)(i)(II) in an amount as yet unknown.

85.     Because TuneCore's remedy at law is inadequate, TuneCore seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and other legitimate business interests. TuneCore's business is reliant on its ability to confidentially develop marketing, product, and pricing strategies in a competitive market and TuneCore will continue suffering irreparable harm absent injunctive relief.

86.     TuneCore has a substantial likelihood of success on the merits because of Khan-Thompson's blatant, willful, and malicious misappropriation of trade secrets through the improper and unlawful methods as alleged herein.

## SECOND CAUSE OF ACTION
### (Common Law Misappropriation of Trade Secrets Against All Defendants)

87.     TuneCore repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

88.     TuneCore has expended considerable resources over many years to discover, amass, and protect certain non-public, highly valuable confidential and proprietary business information and trade secrets, including its marketing, distribution, content, pricing, and engineering strategies, as well as its client lists, product information, and financial data.

89.     Such information gives TuneCore a significant competitive advantage over its existing and would-be competitors, including CD Baby.  This advantage would be lost if this information became known to CD Baby.

90.    TuneCore has made reasonable efforts to maintain the confidentiality of its proprietary business information and trade secrets, including having certain of its employees (including Khan-Thompson) sign confidentiality agreements and undergo training with respect to TuneCore's confidential and proprietary information policy.

91.    TuneCore's confidential and proprietary business information and trade secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefits from their disclosure.

92.    By virtue of her executive position at TuneCore, as well as the PIA, the Employee Handbook, and the TSA, Khan-Thompson owed TuneCore the duty to refrain from disclosing or exploiting its confidential and proprietary business information, trade secrets, and know-how for her own benefit, for the benefit of CD Baby or other competitors, or to the detriment of TuneCore.

93.    Khan-Thompson misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

94.    Khan-Thompson misappropriated such information in her personal capacity as well as in her capacity as CD Baby's Senior Vice President of Marketing and Community Engagement.

95.    The trade secret information accessed and stolen by Khan-Thompson includes (but is not limited to) approximately 50 unique documents identified by TuneCore, as described more fully above as the Confidential Information.

96.    Because Khan-Thompson serves as Senior Vice President of Marketing and Community Engagement at CD Baby, TuneCore's direct competitor, it is inevitable that Khan-Thompson will rely on, draw from, and disclose (and CD Baby will benefit from) the

confidential and proprietary information and trade secrets she misappropriated from TuneCore, all to the detriment of TuneCore.

97.     As a direct and proximate cause of Khan-Thompson's misconduct, TuneCore will suffer immediate and irreparable injury that cannot be adequately redressed at law, unless Khan-Thompson, and all those acting in concert with her, are enjoined from engaging in any such misappropriation, use, or dissemination of confidential and proprietary business information and trade secrets.

98.     In addition, because the harm caused by Khan-Thompson's misappropriation of TuneCore's confidential, proprietary, and trade secret information cannot be fully remedied through an award of monetary damages alone, TuneCore also is entitled to preliminary and permanent injunctive relief preventing Khan-Thompson from further using or disclosing TuneCore's confidential and proprietary information.

### **THIRD CAUSE OF ACTION**
**(Violation of the Computer Fraud and Abuse Act Against All Defendants)**

99.     TuneCore repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

100.     The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g), allows any person who suffers damage or loss pursuant to the CFAA to maintain a civil action for compensatory damages or injunctive relief or other equitable relief.

101.     TuneCore's computer systems, including its cloud-based network, are used in TuneCore's commerce and communication and constitute a "protected computer" as defined by 18 U.S.C. § 1030.

102.     Khan-Thompson intentionally accessed TuneCore's computer system without authorization, including after her employment with TuneCore ended and at times while she

19

worked for a direct competitor, defendant CD Baby, and she has done so for the purpose of private financial gain and/or in furtherance of one or more tortious acts in violation of New York law.

103.    Khan-Thompson intentionally accessed TuneCore's computer system in her personal capacity as well as in her capacity as CD Baby's Senior Vice President of Marketing and Community Engagement.

104.    Khan-Thompson's conduct has caused damage and loss to TuneCore within the meaning of 18 U.S.C. § 1030 in an amount of more than $5,000, including but not limited to losses sustained in investigating, responding to, and taking remedial steps regarding her actions.

## FOURTH CAUSE OF ACTION
### (Breach of Contract against Khan-Thompson)

105.    TuneCore repeats and realleges the allegations in the preceding paragraphs of this Complaint as if set forth fully herein.

106.    The PIA and TSA are valid and enforceable contracts, entered into between TuneCore and Khan-Thompson.

107.    TuneCore performed all of its duties and obligations under the PIA and TSA.

108.    Khan-Thompson materially breached the PIA and TSA as alleged above.

109.    Khan-Thompson's breach of contract has caused, and will continue to cause, TuneCore to suffer substantial injury that is difficult to calculate, and irreparable harm to its business, reputation, and goodwill.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty against Khan-Thompson)

110.    TuneCore repeats and realleges the allegations in the preceding paragraphs of this Complaint as if set forth fully herein.

111. By virtue of her prior position as TuneCore's Vice President of International, Khan-Thompson had been entrusted with a fiduciary duty to TuneCore which survived her termination, to refrain from taking action that undermines the financial livelihood of TuneCore.

112. Khan-Thompson has intentionally, maliciously and without justification breached her fiduciary duties to TuneCore by, inter alia, creating a backdoor to TuneCore's system during her employment for the purpose of accessing and downloading the confidential and proprietary information described above.

113. By reason of the foregoing, TuneCore has and will suffer substantial injury that is difficult to calculate, and irreparable harm to its business, reputation, and goodwill.

### SIXTH CAUSE OF ACTION
**(Unfair Competition Against CD Baby)**

114. TuneCore repeats and realleges the allegations in the preceding paragraphs of this Complaint as if set forth fully herein.

115. CD Baby's use of the Confidential Information will allow it to build and expand its sales using knowledge, trade secrets, and confidential and proprietary information improperly obtained from TuneCore.

116. By virtue of the foregoing, CD Baby has engaged in unfair competition and will continue to compete unfairly with TuneCore if it is permitted to use the Confidential Information.

117. The acts of unfair competition include Khan-Thompson and CD Baby's use of TuneCore's confidential and proprietary information to unfairly compete with TuneCore to its detriment.

118. As a result of CD Baby's unfair competition, TuneCore has been and continues to be irreparably harmed.

119. CD Baby's unfair competition has caused and will continue to cause TuneCore to suffer substantial injury that is difficult to calculate, and irreparable harm to its business, reputation, and goodwill.

## SEVENTH CAUSE OF ACTION
### (Tortious Interference with Contract Against CD Baby)

120. TuneCore repeats and realleges the allegations in preceding paragraphs of this Complaint as if set forth fully herein.

121. Upon information and belief, CD Baby had knowledge of the PIA and TSA and acted with full knowledge thereof.

122. The PIA and TSA are valid contracts with which TuneCore has fully complied.

123. CD Baby, acting at times through its agent, Khan-Thompson, undertook to improperly obtain the Confidential Information in breach Khan-Thompson's confidentiality and non-disclosure obligations under the PIA and TSA without justification, as alleged above.

124. Upon information and belief, Khan-Thompson's conduct was undertaken in furtherance of her role at, and for the benefit of, CD Baby.

125. Upon information and belief, the Confidential Information improperly obtained has been communicated to and used, and is being used, by CD Baby to compete with TuneCore, contrary to the terms of the PIA and the TSA.

126. As a result of CD Baby's interference with the PIA and TSA, TuneCore has been and continues to be irreparably harmed.

127. By virtue of the foregoing, CD Baby has caused, and will continue to cause, TuneCore to suffer substantial monetary damages, in an amount to be determined at trial, as well as injury that cannot be calculated, and irreparable harm to its business, reputation, and goodwill.

**WHEREFORE**, TuneCore respectfully demands that this Court enjoin Khan-Thompson and CD Baby from continuing the tortious and unlawful activities described above, and that this Court issue judgment as follows:

(a) Temporarily, preliminarily, and permanently enjoining defendants from accessing and/or attempting to access TuneCore's network, online and/or cloud-based accounts or systems, including but not limited to its Google Workplace Accounts and/or any of TuneCore's cloud-based servers and shared drives;

(b) Temporarily, preliminarily, and permanently enjoining defendants from disseminating and/or using any of TuneCore's Confidential Information;

(c) Temporarily, preliminarily, and permanently enjoining defendants from accessing, using, altering and/or deleting the online Google Workspace user account and credentials for any account associated with the username or email address faryal.khan.thompson@gmail.com, including any such account previously used to gain access to and transfer TuneCore's Confidential Information;

(d) Temporarily, preliminarily, and permanently enjoining defendants from contacting any of the individuals, or their agents, listed on TuneCore's Excel spreadsheet entitled, "#IndependentAF VIPs List for Merch Drop.xlsx"; and

(f) Granting TuneCore the following provisionary relief in the form of expedited discovery, including:

    (i) An accounting by Khan-Thompson identifying (a) all of the TuneCore, Inc.'s documents, data, and information that she (i) retained prior to and/or following her employment termination on March 22, 2023, and/or (ii) downloaded, exported, transmitted, copied and/or transferred following her

employment termination on March 22, 2023; and (b) the present location of all such documents, data and information;

(ii) An accounting by Khan-Thompson identifying all of the individuals and entities to which she has transferred, shared, shown, or disseminated any of the TuneCore Confidential Information and/or any other information identified by Khan-Thompson pursuant to paragraph (f)(i) above;

(iii) An accounting by Khan-Thompson, identifying in writing: (i) cell phones, mobile devices, I-pads, laptops, tablets and personal computers (hereinafter "physical devices") used by her between October 12, 2020 and November 27, 2023; and (ii) online email and other accounts (*e.g.*, iCloud, MSN, Google) (hereinafter "online accounts") used by her between October 12, 2020 and November 27, 2023;

(g) Ordering Khan-Thompson to provide to Plaintiff's forensic vendor: (i) her physical devices identified in paragraph (f)(iii) and their associated passwords at a mutually convenient time and place for pick up for mirror imaging and/or other forensic collection and analysis to be performed at the forensic vendor's facilities; (ii) the usernames and passwords for the online accounts so that Plaintiff's forensic vendor may obtain access to perform a forensic collection and analysis of those accounts; and (iii) the username and password for the online Google Workspace user account and credentials for faryal.khan.thompson@gmail.com previously used in connection with gaining access to and transferring TuneCore's Confidential Information so that Plaintiff's forensic vendor may obtain access to perform a forensic collection and analysis of that account;

(h) Ordering that, following receipt of the Khan-Thompson's physical devices and access to the online accounts associated with the username or email address faryal.khan.thompson@gmail.com, including any such account previously used to gain access to and transfer TuneCore's Confidential Information,

    (i) Plaintiff's vendor will follow its standard forensic protocol for collection, analysis, and retrieval, including locating any TuneCore Confidential Information and/or information identified by Khan-Thompson in paragraph f(i) above. The analysis may include, but may not be limited to, browsing directories, folders and file structures, concept and key word searching, review of forensic artifacts, indicia of wiping technologies, trash bin activity, review of metadata (including but not limited to creation, modified and last accessed dates), manual review of forensic artifacts, documents and communications, review of deleted, slack, fragmented or unallocated space, link file analysis, and review of mobile communications databases and key transmission data, as well as any other industry standard forensic techniques that plaintiff's forensic vendor determines in its professional judgment should be used to collect, analyze, recover and document ESI.

    (ii) Following its analysis, plaintiff's forensic vendor will retrieve, recover, and remove all TuneCore Confidential Information and/or any documents, data and/or information identified by Khan-Thompson in paragraph (f)(i) above from the physical devices and online accounts to ensure a verifiable return of such information to TuneCore. Following a verifiable return of all

TuneCore Confidential Information, Khan-Thompson's physical devices will be promptly returned to her.

(i) Ordering that CD Baby:

    (i) Shall produce to TuneCore, Inc. an accounting, identifying (i) any TuneCore Confidential Information; and/or (ii) any documents, data and/or information identified by Khan-Thompson in paragraph (f)(i) above stored on CD Baby's network, systems, endpoints, online accounts or any other electronic storage devices, media or locations, including but not limited to cloud-based servers and accounts;

    (ii) Shall conduct and produce to TuneCore, Inc., the results of a forensic examination of CD Baby's network(s), systems, endpoints, online accounts or any other electronic storage devices or locations, including but not limited to cloud-based servers and accounts, searching for, locating, and documenting any TuneCore Confidential Information and/or any and all documents, data and/or information identified by Khan-Thompson in paragraph (f)(i) above; and

    (iii) Shall return to TuneCore, and cause any electronic copies, of TuneCore information identified in the forensic examination to be forensically removed from CD Baby's network(s), systems, endpoints, online accounts or any other electronic storage devices or locations.

(j) Granting TuneCore damages against CD Baby as may be allowable under the law; and

(k) Granting TuneCore such other and further relief as is just and proper.

Dated: New York, New York
      November 27, 2023

Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.

By: /s/Eric W. Moran
    Eric W. Moran
    David J. Clark
    Michael Brodlieb
875 Third Avenue
New York, New York 10022
Telephone: (212) 351-4500

*Attorneys for Plaintiff TuneCore, Inc.*